Parker C. J.
This bill seeks to set aside a settlement of accounts and contract made between the defendant and the administrators of Tuthill Hubbart, in the year 1808, the subject of which was an insurance account subsisting between Hubbart and the defendant for several years, and not adjusted in the lifetime of Hubbart. The defendant was an insurance-broker from the year 1785 to the year 1803, keeping an office in which Hubbart and divers other underwriters were accustomed to underwrite policies of insurance, and during that period a vast amount of insurance business was transacted under the particular care and inspection of the defendant, who was the general agent of that office, he keeping all the accounts for the underwriters, receiving premiums and paying losses, and receiving a commission for his services. It appears also, that there was a private agreement of copartnership between the defendant and Hubbart, not known to the other underwriters in the office, in virtue of which the defendant became interested in one fourth part of all sums underwritten by Hubbart in regard to premiums and losses. This copartnership commenced in October 1794, and continued until June 1803, when the defendant discontinued keeping the office ; at which time there were large balances due to Hubbart, which remained unadjusted till his death. In January 1808, Hubbart died intestate, and soon afterwards administration of his estate was committed to Elizabeth Partridge, his sister, and William Gooch, who was the husband of another sister of Hubbart, he having died unmarried agd without children.
On the 4th day of April, 1808, the defendant paid to the .administrators $ 60,C00, as and for a full settlement and discharge of all the claims in behalf of Hubbart’s estate against him, and the administrators, having received that sum, subscribed a receipt in the following words, viz : “ Boston, April 4, 1808. Received of Peter Chardon Brooks sixty thousand dollars in full *218 for the whole underwriting account of Tutbill Hubbart deceased, in the office formerly kept by said Brooks, from the period of said Hubbart’s first beginning to underwrite in said office up to this time. The agreement between us »nd the said Brooks being, that the said underwriting account of said Hubbart, with all its advantages and with all its disadvantages, be wholly the property of said Brooks, in like manner as if the said Brooks had been the original underwriter instead of sari Hubbart. E. Partridge, W. Gooch, administrators, &c. Attest, Aaron Bean.”
It is this receipt which is sought to be set aside, and this bill alleges various grounds as operating in equity to defeat the otherwise legal effect thereof. It is alleged, that Hubbart was an old and infirm man during the latter part of his life ; that his mind was enfeebled, so that he was unable to understand and take care of his concerns ; that he did not know and was not informed of the state of accounts between himself and the defendant ; that the accounts were not kept in a clear and intelli gible manner, but were so irregular and confused that Hubbart could not, if he had inclined, gain any knowledge thereof; that an attempt was made by the defendant, after the dissolution of the copartnership, to procure a partial and unjust settlement, by taking advantage of the infirmity and incapacity of Hubbart; that after his death, a statement was made out by the defendant and given to the administrators, showing a balance in his hands of $ 64,0! 0, which was erroneous in omitting many sums which ought to have been credited, and charging others which ought not to have been debited to Hubbart’s estate, so that the real balance in his hands was $ 68,000, and that there was also presented to the administrators a list of claims against the insurance account of Hubbart, which was exaggerated and false, and that upon this statement and list of claims, the administrators, supposing them to be true and reposing confidence in the defendant, were induced to accept his offer of $ 60,000 and give him the receipt, discharge and transfer before mentioned.
The answer to this bill denies all unfair advantages taken or attempted to be taken of Hubbart in his lifetime, or of the administrators ; alleges that the settlement was free and voluntar) on their part ; that Hubbart, though aged and infirm, was oi *219 competent capacity to understand his rights, and that he had full knowledge, or opportunity of knowledge, of the state of accounts between them ; that he constantly visited the office, and frequently inspected the books, and that annually he had presented to him, or might have taken, like the other underwriters, an account, showing the exact state of his concerns in the office ; that the defendant never concealed any thing from him, but was always desirous and willing to settle with him and pay any balance that was due ; that after the business of the office was closed, the defendant frequently urged him to a settlement, and was desirous of settling in any way Hubbart should choose, and proposed to pay a gross sum, as he had done to other underwriters, who had concurred in his proposal, only on account of the great difficulty of making a minute adjustment of all the affairs in the office ; that after Hubbart’s death, the defendant made the same proposal to the administrators for the same reason, offering to them an examination of all his books and accounts, and exhibiting the same to a person selected by them, of competent skill, and was ready to assist in any investigation which should be required ; that the person so selected did examine the books and receive all necessary aid from the defendant therein, and that after having examined as far as he desired, he recommended to the administrators to accept the offer of the defendant, and that they did, after full deliberation and after consultation with all interested in Hubbart’s estate, freely and without any influence or misrepresentation on his part, receive the money offered, and thereupon signed the receipt and transfer before mentioned, signed in the presence of Aaron Bean, their confidential friend and adviser.
Many special interrogatories are appended to the bill touching divers subjects connected with the insurance business, and are answered in such manner as to exonerate the defendant from any liability to account.
The amended bill traverses and denies all the exculpatory statements in the answer, and reasserts the charges in the bill.
The answer to the amended bill reaffirms all the denials and assertions contained in the first answer, and thus the parties are bright to issue on a vast mass of allegations and denials, which, though difficult, it is necessary to analyze and reduce into a *220 form as simple as possible, in order to come to an opinion upon true merits of the case. The arguments and statements of counsel have much facilitated our labor in the investigation of the voluminous matter of the bill, and yet it is not without anxiety, arising from our incessant devotion to other necessary official duties, that we enter into an exposition of so complicated a case, consisting of disputable points of law as well as fact, and requiring perhaps a more minute examination than, under the circumstances in which we have been placed, we may have been able to bestow.
The general object of the bill is to set aside the contract made between the defendant and the administrators of Tuthill Hubbart in April 1808,.almost twenty years before the filing of the bill. That contract has a double aspect, being in its terms a receipt and discharge from all claims and demands in favor of the estate of Hubbart against the defendant,- and also a conveyance or transfer of all outstanding rights or claims in favor of the estate, on account of the insurance business which had been transacted by the defendant, either as a partner with Hubbart, or as the broker of the office in which that business was transacted. The writing containing this contract being signed by the administrators and acknowledging the receipt of $ 60,000 by them, in full satisfaction of all claims and demands against the defendant, is sufficient in form to accomplish its two ostensible purposes, and it cannot be impeached or invalidated without proof that it was obtained fraudulently from the administrators, in the sense in which that term is used by courts of equity, when exercising their power over such transactions ; and that sense is certainly more broad and liberal than that which is applied to the same term by courts of law, it being held by all the elementary books, as well as in most of the judicial decisions, that unfair advantage taken by one party to a bargain, of the other, misrepresentations of facts and circumstances material to the bargain, or the concealment of such facts and circumstances, will form a good ground in equity for setting aside such bargains. Mistakes or errors also will have the same effect to a certain degree ; that is, so far as to compel a correction of the mistake discovered ; but without effect otherwise upon the bargain ; upon the principle of surcharging and *221 falsifying, of which we shall hereafter speak; which is the technical mode in equity of allowing the party aggrieved, notwithstanding a settlement which cannot be overturned, to make additional charges and to disprove any credits which have been allowed or omitted by mistake. The great object of this bill being to open the whole account between these parties, which apparently was settled so long ago as has been stated, and to oblige the defendant to render a new account in the same manner as if no settlement had taken place, it is apparent that nothing short of fraud ought to effect this purpose, and that it ought to be made very clearly to appear, by evidence of sufficient weight to overpower the defence contained in the answer ; * for a party called into a court of justice after a lapse of twenty years, to investigate and explain all the minute facts-relating to multifarious and complicated concerns of many years of most extensive and intricate business, cannot but be put to disadvantage, and may exhibit an unfavorable appearance merely from the difficulty, if not impossibility, of making such statements and explanations as might have been easy upon an Inquiry made at the time of the adjustment, or recently afterwards.
The counsel for the plaintiff are aware of the position in which they stand, and have undertaken to maintain it by the allegation of fraud on the part of the defendant, in procuring the settlement which is sought to be avoided. Not that they have made any direct allegation of fraud in their bill, but they assert that the facts therein stated and sustained by proof, constitute fraud, if not direct, yet of a constructive nature, such as is hilden, in courts of equity, sufficient to vitiate and destroy any contract or bargain.* And if the ground they take is *222 maintained, the relief they seek belongs to them, notwithslanding a supposed defect in the bill in omitting the direct charge of fraud, unless for other causes which we shall be obliged to consider, the relief must be withheld. Such a cause is supposed to exist in the statute of limitations, which is insisted on in the answer as a bar to the bill; a discussion of which, in its application to this case, will be necessary, but will be postponed until other parts of the cause have been treated, which, under the circumstances of the case, we think it our duty to bestow more attention upon.
The bill alleges various grounds on which it is insisted, that the relation between Tuthill Hubbart and the defendant, and afterwards between the administrators of Hubbart and the defendant, was such as to create a trust and confidence on the part of the defendant, which, by the principles of equity, imposed duties on him in regard to the business intrusted to him, the violation of which deprives him of the right of setting up the settlement of 1808 as a bar to the claim of the present plaintiff, who is administrator de bonis non of the estate of Tuthill Hubbart. To lay the foundation of his claim, the plaintiff alleges that the defendant had the entire management and control of the business while the partnership existed ; that he received all the profits and proceeds of the copartnership, keeping the books and accounts in his own way, and so that it was difficult for any of the underwriters and especially for Hubbart, to learn the true state of the accounts and of his interest in them ; that Hubbart was an aged, infirm and imbecile man ; and that the defendant took advantage of his own skill and of the ignorance of Hubbart, to withhold from him all knowdedge of the true state of the partnership concerns, and that after the dissolution of the copartnership, he attempted to influence and persuade Hubbart to enter into a compromise to his own advantage, and the consequent loss of Hubbart.
These allegations are all expressly denied by the defendant, so that it becomes matter of proof, either by two witnesses, according to the course of equity proceedings, or by the docu *223 mentary evidence produced, consisting principally of account books and vouchers, which have been brought forth by the defendant in obedience to various decretal orders heretofore passed in the course of this cause.
In regard to the age, infirmity and mental imbecility of Hubbart, there is much evidence, which has been considered by the Court.
His age and bodily infirmity are not denied, but in relation to his capacity to transact business with intelligence, there is contrariety of evidence. We understand the law to be, that no degree of physical or mental imbecility, which leaves the party legal competency to act, is of itself sufficient to avoid a contract or settlement with him ; *1 but if advantage is taken of his weakness to draw from him a contract or settlement which is unfavorable, by misrepresentation, imposition, or undue influence, such contract or settlement cannot be upheld in a court of equity. But we do not see any proof of facts which should give such a character to any transactions between the defendant and Hubbart himself. It is proved incontrovertibly, that Hubbart had the same means of information in relation to his insurance affairs as all the underwriters bad ; that the books were always open to the inspection of all concerned in the office ; that Hubbart frequently had recourse to them, and that a sheet, giving a general account of the state of the business of the office with each underwriter, was annually made out for their use, and that it lay upon the desk open to the inspection of all. These sheets stated the balance of each underwriter’s account, and the books were always at hand to be examined by those who might wish to obtain a more particular knowledge. It does not appear that Hubbart was unable to investigate h:« accounts, or that he ever desired a more full disclosure, or that he made any inquiries which were unanswered. And it appears by the testimony of Russell", that after the dissolution of the copartnership and after the defendant retired from the office, *224 and his duties devolved upon the witness, Hubbart continued tc transact business in the office with as much skill and intelligence as he had ever done, and was a successful underwriter in Russell’s and other insurance offices.*
We see nothing in the course of the transactions of the defendant as the agent and broker of the office, or in his dealings with Hubbart in their joint concern, which can justify a charge of fraud or even impropriety against the defendant. Much of the evidence relating to Hubbart’s conduct may be referred to the peculiarities of his character, and if his mind had become much impaired, it does not appear in this stage of the connex ion, that any fraud was practised upon him, or any control or influence exercised over him to his disadvantage. He reposed, without doubt, entire confidence in the defendant, but it does not appear to have been violated. Large sums of money were in the defendant’s hands belonging to Hubbart, but there is no evidence that he attempted to withdraw it; on the contrary, it is asserted in the answer, and there is corroborative proof, that he chose to consider the defendant as his banker, that he drew upon him when he wanted money, and his draughts were paid, and that he often expressed a desire that the money should remain as it was. There is a total failure of proof, that while the copartnership continued, there was any cause of complaint on the ground of unwillingness to settle and render an account, or to pay over money due, or to exhibit any statement. Indeed there appears not to have been any complaint by Hubbart in his lifetime, nor by his administrators or heirs after his death.
But it is said there was an attempt to induce him to settle with and discharge the defendant upon payment of a less sum than was due, upon a general statement of balances, without particu *225 lar information of the real state of the accounts ; and that a great display of difficulties in going over the books and making minute statements, was held up, to induce him to come into such a compromise as was afterwards effected with the administrators, on which occasion an exhibit of outstanding claims was made, similar to that which was presented to the administrators previous to the adjustment made with them. It would be exceedingly harsh to impute a fraudulent intention in these proceedings. The defendant was closing his business as an agent for the office ; he had numerous underwriters to settle with ; the accounts were multifarious and complicated ; and the books in which they were contained were numerous. To wish and to propose to settle by compromise, and to pay a gross sum without any minute examination, furnishes no indication of a design to defraud Hubbart. This mode of settlement was not compulsory upon him ; he could exact a complete and perfect statement of accounts. If he were too old or feeble to judge of the expediency of accepting the propositions, he bad capacity to consult his friends, those who had been associated with him in business, and who had similar transactions with the defendant; and it appears by papers in the case, that the mode of settlement proposed to Hubbart, had been proposed to and adopted by other underwriters. The use made of these circumstance's by the counsel for the plaintiff, we presume, is to show a premeditated design on the part of Brooks, to bring about an unfair settlement with Hubbart in his lifetime, in order to give additional force to the charge of a fraudulent and unfair settlement afterwards with the administrators. As no settlement was made with Hubbart, there can be no importance attached to these circumstances, but in this view, and in this view only can the evidence and arguments touching the transactions with Hubbart be relevant; but we see nothing in the facts relied upon which can raise a reasonable presumption of a design to circumvent Hubbart or to take advantage of his situation.
The merits of the case, therefore, will rest upon the actual circumstances attending the contract made with the administrators themselves, in April 1808, when a compromise took *226 place, the evidence of which is exhibited in the proceedings.* That contract, if not fraudulent, is a complete bar to the plaintiff’s claim. It was a contract which the administrators had authority to make. It was known to all the heirs of Hubbart, whose interest it was to affect, and it was sufficiently deliberate to remove any imputation of surprise, if there were no misrepresentation or intentional concealment of facts essential to a thorough knowledge of the rights of the parties. But this set" tlement may be avoided in a court of equity, if it is made apparent that it was extorted or procured by any means inconsistent with fair dealing, by withholding information which ought to have been communicated, or by false representations calculated to mislead the party contracted with, and induce him to give up his just claims ; so as to present a case of fraud, actual or constructive, according to acknowledged principles in courts of chancery.
To lay the foundation of this charge in the transaction with the administrators, it is alleged, that the defendant is a shrewd, skilful, intelligent man ; that he had perfect knowledge of the true state of the accounts between him and the intestate ; that the other contracting party, the administrators, were superannuated, unacquainted with business of the nature of that about which they were contracting, and that they reposed entire confidence in the integrity of the defendant, trusting altogether to his representations ; so that they were not upon equal footing with him ; were liable to be, and in fact were, imposed upon by statements which upon subsequent examination have turned out to be false. This is a heavy charge, and it demands a serious investigation of the evidence and facts which are supposed to maintain it.
In regard to the capacity of the administrators, the evidence is not contradictory to an extent which can leave much doubt on the mind. One of them, Mrs. Partridge, it appears took no concern in the settlement, except to sanction it with her name ; the business of the administration being conducted solely by Mr. Gooch. The degree of Mrs. Partridge’s capacity, there *227 fore, it is not material to settle. Gooch was at the time short of seventy years of age, was a man of good common understanding, held an office of some responsibility in the town of Boston, and was intrusted (with the approbation of the heirs) with the management of the large estate of Tuthill Hubbart, as acting administrator. Surely it cannot be pretended he was wanting in legal capacity to contract. Even six years after this he was intrusted with the execution of Mrs. Partridge’s will, and appears to have discharged the trust with common intelligence and skill. He however was unskilled in mercantile, and particularly in insurance business, and therefore would not be likely to conduct so important an affair as this contract with Brooks, without advice and assistance.
There was nothing, therefore, in the character or qualifica tions of the party contracted with, to raise a presumption of fraud, or to dispense with the proof that is usually required to establish it; for though, in equity, fraud may be presumed from circumstances which might not amount to proof in a court of law, I should presume that not even a court of equity would undertake to impute it merely because one party is more intelligent than another, although the bargain may turn out advantageously to the wiser party. The authorities will not warrant such a position.
The parties then being able to contract, and having contracted under circumstances which of themselves "furnish no indication of fraud, and the answer of the defendant denying every thing of an unfair nature in the transaction, it is obvious that the plaintiff must produce satisfactory proof of his allegation, or he must fail to support his bill. Aware of this, he has selected certain facts and circumstances attending the settlement, which ne supposes are sufficient for this purpose. These will be more particularly attended to.
And first, the plaintiff would clothe the defendant with the character of a trustee, over whose transactions, in relation to the trust fund, courts of equity are particularly watchful, because of the temptations trustees are under and the opportunities they have to serve their own interest to the prejudice of the cestui que trust. They cannot be themselves the purchasers of trust property but under severe vigilance of the law, and they *228 cannot deal with the cestui que trust without the utmost good faith and the most thorough disclosure of all they know respecting the property.* It may well be doubted however, whether Brooks, at the time of the compromise, could be considered the trustee, in a strict sense, of the administrators or of the estate of Hubbart. If while a partner he could be so considered, the relation ceased with the dissolution of the partnership ; if as agent and broker he was trustee of the underwriters, he ceased to be so when he left the office. In the first case, he stood as the debtor for the balance of profits resulting from the insurance business in which he was connected with Hubbart; as broker, he was indebted to each underwriter for his balance of the insurance account. Actions at law could be maintained against him in either capacity, and we do not see that the relation of debtor imposed upon him any peculiar obligation. He might settle his accounts, or compromise with his creditors, without any other restriction than what integrity and good faith would’ require. Like any other man making a bargain, he must deal fairly, misrepresent nothing, and give to his creditor all the (facility in his power to know the value of the interest which is the subject of the bargain. He might be constructively a trustee for the purpose of becoming subject to tribunals of equity, being compelled to make disclosures, &c. but would be subject to no stricter rules of account than if an action at law should be brought against him. His bargain would be set aside if fraudulent in fact, or if constructively fraudulent; as it would be, I should suppose, at law. But if bona fide on his part, and no advantage taken of his superior knowledge, or of the ignorance of his creditor, the bargain will be valid, although he may *229 gain advantage by it; and in this case he differs from a rustee in the strict sense, who is scarcely allowed to purchase of the/ cestui que trust at all ; and this distinction is of importance in a subsequent branch of this case.
We consider the defendant then, before the 4th of April, 1808, as the debtor of the estate of Tuthill Hubbart upon an unsettled account, proposing terms of compromise which are accepted by the other party ; the effect of which is, by the payment of $ 60,000, to be discharged of a larger sum, and to acquire the right of the other party to all the proceeds of insurance contracts remaining unsettled or contingent at the time of the compromise ; and the other party, the administrators, being able and having lawful authority to contract, the contract cannot be avoided or set aside, but by proof of fraud, either actual or constructive, in making the bargain.[1]
The facts and circumstances relied on as proving fraud on the part of the defendant, result from a statement made by him of the balances of several annual accounts, making an aggregate which represented the final balance due to Hubbart, and of the outstanding debts represented as bad, which are deducted, and claims upon a number of policies underwritten by Tuthill Hubbart.
In the order pursued by the senior counsel in the argument of the case, the first point to which our attention was called, was errors in the balances exhibited in the statement which was the basis of the compromise or adjustment, consisting of omissions of credits, which ought to have been given, of interest, salvages, &c. and of misstatements and deductions on account of old or bad debts, represented by the word “ outs,” by which means the balances were improperly reduced ; and the aggregate of these balances was nearly $ 5000 short of the true amount, as ascertained by Stimpson, who, with great labor and accuracy, has gone over the books, traced each item to its source, and detected the errors which constitute the gross sum before men *230 tioned. It is admitted by the answer, that there were errors of the description, though not to the amount, stated by Simpson. Without doubt, if the account of balances thus erroneous was designedly exhibited with a view to present a smaller aggregate, in order that the defendant might purchase his discharge for a less sum than otherwise might be required, this alone would defeat the settlement and open the whole account to a new adjustment. But the answer wholly denies any such fraudulent design, or any knowledge of the existence of such errors. And we are all of opinion, that errors of the kind stated, in an account of many years’ standing, of transactions so various and complicate, relating to a business necessarily involving many accounts with other persons, have not much tendency of themselves to prove fraud in the defendant. Besides, we take into view what is stated by the defendant, and what the form of final adjustment shows to be true, that an exact settlement of accounts was not the object of either party, but the proposition made to the administrators was for a compromise or adjustment for a gross sum, having relation to the apparent indebtedness of the defendant, as it appeared on the books, but avowedly founded upon the inconvenience, to both parties, of a minute investigation. The balances, as they stood in the books, were correctly stated in the exhibit; the errors arose from some deficiency or inaccuracy in keeping the books during a long series of years, not extraordinary even in a skilful accountant, considering the great mass of subjects to which those books applied. The books themselves, together with the papers from which the errors were detected, were within the control of the administrators, and were actually examined, as far as they wished, by a person in whom they placed confidence.* these books and vouchers were not fraudulently fabricated, which is hardly suggested, errors in them ought not to form a ground for avoiding the compromise, for it was not the fault of the defendant that they were not more minutely examined.^ Admitting that Aaron Bean was not an accomplished book-keeper, or that lie was unskilled in the Italian mode of book-keeping, still he was a man of education, had been a man of business, and surely *231 must have had intelligence enough to be able to discover how far his examination would be useful to his employer, and, without doubt, of sufficient fidelity to have warned his friends and employers of the necessity of a more thorough examination, if an exact settlement bad been intended ; but he advised them to accept the offer of Brooks. He made no inquiries which were not answered, asked for no papers which he did not obtain. If his examination was slight, or he was incompetent to the task, who were responsible for his deficiency ? Certainly those who employed him
Would it not be unjust to fix on Brooks the gross charge of having manufactured his documents and evidence, and presented a false statement with a fraudulent intent, under circumstances like these, when ther,e is no evidence that any undue influence was exercised over Bean by the defendant, any misrepresentation made to him, any thing said or done to blind or mislead him, or to throw obstacles in the way of a thorough inquiry ? The answer wholly denies charges or imputations of this kind ; there is not the slightest evidence to support them, and the circumstances of the case do not favor such a supposition. The object of the administrators, in employing Bean, was to ascertain whether it was prudent and proper for them to take the sum offered by Brooks to close the accounts. A general inspection of the books is all that would be thought necessary for this purpose. It was evidently not expected by the administrators, or intended by Bean, to trace the whole account through all the books and documents, in order to come to an exact settlement. Such a settlement was not proposed nor intended, but a bargain founded upon nothing but a general view of the state of the accounts. It is impossible to derive any support to the charge of fraud in regard to this part of the transaction. . Whether, as there were errors to a considerable amount affecting the aggregate of balance upon which the settlement is supposed to be founded, there is ground to surcharge and falsify, is a subject for inquiry hereafter. Certainly it furnishes no cause for setting aside the settlement on the ground of fraud, either actual or constructive. Mere errors are never allowed to be a ground lor opening the account.
This disposes of that part of the case which rests upon ac *232 tual or supposed errors in the statement of balances, consisting, according to the specification, of omissions to credit Hubbart with interest, with two small salvages, with commissions on return of premium, deduction for bad debts, interest received, &c.
A second ground on which the charge of fraud is supposed to rest, is the withholding any credit for interest on the balances due to Hubbart from year to year, amounting to a very large sum, and which it is insisted now the estate of Hubbart was entitled to receive, on the general ground, that the defendant held these moneys as trustee, or as partner, and is therefore liable for interest, and the particular ground, that he made use of the money in common with his own funds, and for that cause is liable.*
Whether on a liquidation of accounts in a court of law or equity, he would have been charged with interest, is not the question before us, but whether his omitting to credit it in the statement of balances was fraudulent on his part.
)Now it is common doctrine in a court of equity, that in the making of a bargain, what is equally known to both parties need not be stated, in order to make the bargain a fair one.
The sheet exhibited as the basis of the proposed compro mise showed the balance from year to year in the hands of the *233 defendant. Was it a concealment to omit giving credit for interest ? If there had been any agreement with Hubbart that Brooks should be accountable for interest, the omission to credit it would have been fraudulent ; but if there were no such agreement, such an omission would be justifiable, even if it should eventually turn out that he was chargeable, if he believed that he was not accountable. The administrators had full knowledge of the facts upon which they were to ground their claim of interest ; they saw the amount of money in the defendant’s hands, and knew the time it had lain there. Were they deceived ? Could they not have insisted upon interest, and tried their claim at law for it ? Was this so unimportant an item as to escape the attention of Gooch, of A. Bean, of S. Bean, who had married an heir and who was a lawyer, of Sumner, an intelligent man, also interested in the estate ? It required no skill in accounts, or any examination of books, to perceive this omission, or to judge of the importance of it. There was no pressure for money on their part, no necessity to be taken advantage of by the tempting offer of $ 60,000, nor any danger of losing the sum offered by endeavouring to obtain more. Certainly the parties stood upon equal footing in regard to this matter, and there is no reason to suppose they were unwise in making the compromise, so far as relates to this question ; for according to all the evidence, there was no legal or reasonable ground to found the claim of interest upon. It is sworn by Brooks, in his answer, that he was always ready to pay Hubbart whenever he called for money ; that he frequently pressed him to take it, but that he chose to let it lie, and expressed a willingness that the defendant should use it.[1] But even without relying upon the answer, the testimony of Russell, Homer and others, as well as the settlement with other underwriters, shows clearly that no brokers are charged with interest upon balances in their hands. There is no general rule on this subject. If a steward is permitted by his employer to hold money, and is not called upon for his accounts, and the employer can be said to have given a sanction to that practice, by his conduct, there may be cases in which interest would not be decreed. Chedworth v. Edwards, *234 8 Ves. 48. Now in the present case, it is certainly not very deaf) that, if the account was open for settlement, the administrators would prevail in a claim for interest; surely the defendant would have a right to resist such a claim until it were decided against him at law. If so, the omitting to credit it can furnish no pretence for a charge of fraud, nor any ground of complaint for the administrators, or the plaintiff, who has succeeded them ; for the principal was before their eyes as held by Brooks, and they did not even inquire for interest. If they inquired of other underwriters, which they might easily have done, they would have found no cause to prosecute their claim. On the subject of interest, the authorities are somewhat contradictory, as will be seen by consulting those cited in the argument.[1]
Another, and certainly the most plausible ground on which the charge of fraud rests, is the exhibit made of unsettled claims upon certain policies on which Hubbart was an underwriter, which is the supposed consideration for the relinquishment by the administrators, of the difference between $ 60,000, the sum received by them, and the balance represented as due on the statement furnished.
The principal strength of the argument was put forth upon this part of the subject, and it certainly is the only part upon which our minds have entertained any considerable doubt in relation to the charge of fraud, and that not of actual premeditated fraud, for the eloquent and accomplished lawyer who closed this cause for the plaintiff in a manner so true to his client, and yet so courteous to the defendant, explicitly and repeatedly disavowed the intention to charge the defendant writh any thing beyond constructive fraud, that is, with a neglect of duty imposed upon him by the relation in which he stood, to give full and complete information of every thing within his own knowledge touching the value of the interest about which they were contracting.
According to the general current of authorities, any one standing in the relation of trustee, or qua trustee, as agent, *235 lactor, steward, &c. if he would purchase of his principal or employer any estate or property committed to his care, must deal with the utmost fairness, and conceal nothing within his own knowledge which may affect the price or value ; and if he does, the bargain shall be set aside. It is not very easy to extract any precise rule, as to setting aside contracts on the ground of constructive fraud, from the numerous decisions in chancery upon this subject. There are considerable shades of difference in the manner of stating the rule or principle by different judges of the chancery courts, leaving it much to be apprehended, that instead of a general rule applicable to all cases of a like general character, the features of each case have formed a rule for itself, thus opening that broad discretion, which, however it may be disavowed, is practically exercised, and perhaps necessarily so, by courts of equity. It is stated by an eminent chancellor, that there is no head of equity more difficult of application than the avoidance of a contract on the ground that advantage has been taken of distress ; but generally speaking, there can be no title to relief where the advantage or disadvantage of the contract depended upon subsequent contingencies, the result of which must have been equally uncertain to each party at the time of the contract. It is added, that it is a general and most material rule in all cases of accounts, that where there has been a settlement, and the account has either been signed or a security executed at the foot of it, a court of equity will not open that transaction, unless the evidence produced (founded on the charges in the bill) shows the transaction to be so iniquitous that it ought not to be brought forward at all to affect the party sought to be bound. 1 Hovenden on Fr. 160; Drew v. Power, 1 Sch. & Lefr. 192; Chambers v. Goldwin, 9 Ves. 266. Some principles, how-' ever, may be extracted from the decisions which stand not contradicted by others, and therefore may be adopted as rules. One is, that mere inadequacy of price, if the bargain is fair, is no ground of relief.* Another, that if the value of the thing sold depends upon a contingency, although great advantage *236 may be gained, yet the contract shall be sustained. Another l^at aSe or infirmity alone, without practice upon it, shall not avoid a contract. But in all cases, misrepresentatior of facts essential to the fair understanding of the bargain, or concealment of such facts, being within the knowledge of the party who seeks to enforce it, and in some cases (those of trust and confidence) an innocent withholding of information, that is, where the party himself is not aware of the importance |of it, will be ground of relief; in the two former cases, in a j court of law as well as in equity, — in the latter, generally, in equity only ;Vthese courts erecting a higher standard of morality in contracts, and having the surer means of enforcing the observance of it, particularly that inquisitorial power which applies itself directly to the conscience of the party ; though even this latter doctrine is adopted at law in the case of insurance.
Thus it is said by one of the most respectable treatises, “ If upon a treaty for any contract a man makes a false representation, whether knowingly or not, by means of which he puts the party bargaining under a mistake upon the terms of the bargain, it is a fraud, and relievable. in equity.” 1 Madd. Ch. Pr. (2d ed.) 262, cites Long v. Fletcher, 2 Eq. Cas. Abr. 5. That proposition however is not warranted to its full extent by the case cited to support it, though perhaps it is substantially true, viz. that a court of equity would grant relief, for they might do it upon the ground of mistake, if there were no fraud. The case cited is, that the seller pretended that the estate sold was under a lease of sixteen years, whereas it was leased for only six years. I should infer from the word pretended, that he knew of the true duration of the lease, and therefore it was a false representation and fraudulent.
It may be taken as the result of all the cases, that any material misrepresentation, or actual concealment of facts which are essential to a fair understanding of the subject of the contract, its value, and the relative bearing of the offered consideration made by a trustee to the cestui que trust, or by an agent to his principal, is a fraud which will vitiate the bargain ; and that trustees, and those who are affected by that character in a court of equity, or who stand in a confidential relation towards the *237 property and the owner, are still further obliged in their bargains relating to the trust fund, not only not to misrepresent, and not to conceal, but also to disclose every thing known. to them which in the mind of a prudent man would be likely to affect the bargain. And if this is not done, although there may be no design to cheat, it is a constructive fraud. Perhaps the whole doctrine is summed up in this brief sentence, taken from a case in 1 Sch. & Lefr. 209, — Concealment of a material fact, by the party whose duty it is to disclose it, is sufficient to set aside a contract. And in another book, (1 Simons’s Ch. Rep. 89,) it is said, that a partner purchasing must give a fullj account of the state of the property. And in 3 Swanst. 73,j it is said, full information is required. And in 14 Ves. 300,j that although the purchaser may not be aware of the duties of giving information, fyc. which the court would require in the situation in which he stood, it is necessary to impute knowledge which the party may not actually have had.
We subscribe to these doctrines generally, but are satisfied that there must be qualifications suited to cases of an extraordinary nature, in which the strict application of the rule would infallibly produce injustice.
If a trustee or an agent undertakes to purchase of the owner an estate, or stock, or debts, with the condition of which he may be well acquainted, and of which the owner is entirely or partially ignorant, there is no doubt a sufficient disclosure should be made to enable the owner to judge of the adequacy of the offer made. And if there is any thing misrepresented, or concealed, or withheld without a design to conceal, the bargain will be void. But suppose the subject matter of the bargain to be of a complicated nature, such as an account running through many years and many volumes of books, and relating to transactions which may in a measure have gone out of memory ; in such case all which fairness requires would seem to be, to give information sufficient to lead the party into an inquiry, a willingness to answer to all questions put, and a surrender of all the materials of knowledge by the purchaser to the seller. The exhibit of a balance considerably larger than the sum offered for it. is of itself one pretty strong ground for inquiry, and an intimation of contingenciés which may affect the bargain, and *238 if the books and memoranda containing the elements from which the balance is composed, be offered for scrutiny, there seems to be no ground to impute fraud. If the party entering into the contract has the full means of knowledge committed to him by the other party, and does not choose or neglects to ava!, himself of them, it is his own fault if the bargain turns out unfavorable. He may have too much confidence in the party with whom he deals, to think it necessary to go into a particular examination ; but if that confidence is not well placed, the bar gain will not be affected.
By these principles the conduct of Brooks is to be tried, in relation to the representation of unsettled claims on account of which a deduction from the balance of his account was allowed in the settlement. It is not necessary to go through the evidence in relation to each policy, as was done in the argument, on the one side to prove a fraudulent representation or concealment, and on the other to furnish explanations. The very form of the statement shows that it was not the intention of Brooks to exhibit a detailed account of the circumstances relat ing to each voyage or vessel insured. The remarks made upon each policy were calculated to excite inquiry, rather than to mislead. If untrue, and known to be so, this would be actual fraud ; if untrue, and not known to be so, according to some of the cases cited, it would be constructive fraud. But if true, as I believe they are all found to be, to the letter, but brief, and containing nothing but an intimation that there were outstanding claims, the question is, whether, under the circum stances existing at the time, there was any misleading, or any designed withholding of a more full disclosure, for the purpose of bringing about a bargain, unfair and unequal, in which the advantage was to be on his side ; or whether, without such intent, the administrators were hindered or obstructed from a more thorough knowledge of the subject, which has since been obtained.
There are some circumstances to be considered, quite important in determining the- character of this transaction. The statement exhibited is the same which, in the lifetime of Hubbart, had been presented to him, had lain among bis papers, and had come into the hands of the administrators. A similar *239 brief statement had been made to other underwriters previous to settlement with them. What was the object of the statement ? Not to show any liability of Hubbart’s estate for any precise sum, not even to show a liability at all; but to represent that there were outstanding claims which might or might not turn out to be available against the underwriter. The history of every case and the contingency attending it might be ascertained by a recurrence to the books ; certainly by inquiry of Brooks. The books were placed at the disposal of the administrators or their friend Aaron Bean, and Brooks stood ready to aid in any investigation which they required. They must have known, not only that the claims were contingent, but that they did not go to the extent of the liability of Hubbart on the policy, for subscriptions to the amount of $ 10,000 were to be assumed by Brooks, and the allowance made for it on their part was short of half the sum. Was it not their business then to make inquiries as to the nature and extent of their contingent liabilities, and had they not the opportunity so to do ? And is it reasonable that their successor, nearly twenty years after they were satisfied, should resort to this statement as a ground of fraud ? We certainly doubt whether, in the strictest application of the principles of equity jurisdiction even in regard to trustees, after the trust had ceased, a settlement would be avoided for such a cause as this, after so great a lapse of time, even without reference to the statute of limitations ; for there are many cases where what are called stale demands, have been rejected even within the period of six years. Why should this matter have slept eighteen or twenty years, no dissatisfaction being expressed either by the administrators, their agent, or the heirs, either themselves intelligent or represented by intelligent persons, if there had been any ground of complaint originally on account of the deficient information in regard to these policies ? Even that which is relied upon as showing most strongly a concealment, or misrepresentation, or a statement calculated to mislead, was so stated as to lead any man to a further inquiry, if further information was wanted Tn regard to this vessel, the Governor Strong, the remarks are, “ Condemned, but thought to be no loss, —premium returned.” The vessel was in fact condemned as being unseaworthy. Was not *240 this information enough to authorize the administrators to say, allow nothing on account of this vessel ? You say it is supposed there is no loss for which the underwriters are accountable, and that you have given up the premium. Now there was a claim on account of the vessel. There is no suggestion of any thing false. There seems to be no suppression, within the meaning of the term, because nothing more was intended by the statement than-an indication that there was something unsettled. It was in the power of the administrators or Bean to push their inquiries, or to examine the books.
Looking to the circumstances in which the parties stood at the time, the object in view by both, it is not extraordinary that an investigation was not sought for, any further than to compare the balance, stated on the sheet, and those in the books. Here was the large sum of $ 64,000 acknowledged to be due. There were certain contracts unclosed. What the result might be was unknown. There was ground to believe that the contingencies would not amount to a great deal; still there were contingencies, and the accounts could not be completely closed, until these affairs were settled. ‘Brooks was desirous of closing the account. The administrators must have been equally desirous. He shows them a balance of $ 64,000. He states certain subjects on which there might be future claims, the amount of which could not be ascertained. They might amount to little or nothing, or to a considerable sum. He represents them as unsettled, and makes general remarks upon each ; which remarks are true, so far as they go, and are sufficient to show that many or most of the liabilities were not only contingent, but that the eventual liability might not be large. Was it to be expected, that at the first setting out with an offer of compromise he would give a detailed account of each risk ’ Or might he not have honestly supposed, that if the administrators chose to be more fully acquainted, they would make the due inquiries ? They chose their own man to examine for them ; he was not misled, tampered with, or cajoled. He examines as far as he chooses, and advises to the compromise. Can there be an imputation of fraud, under these circumstances, by one now representing the estate, but then an utter stranger to all the transactions ?
*241 But it is said that this is not a case where information sufficient to put the party on inquiry will protect the bargain, because here is an agent buying of his principal, and he is bound to make a full disclosure of the state of the subject of the bargain.[1] This is sound doctrine, but it admits of the qualification before stated ; that is, if the subject is a contingency,—if it relates to matters of a complicated nature, depending upon an; examination of numerous accounts, — and a general statement is made which opens the subject to inquiry, there being no actual misstatement, and the agent is ready to give any information asked for, and he places the books and documents in the hands of the principal, — and under these circumstances the compromise offered is accepted, —it is not a case for relief in equity, if the agent should gain by the bargain. Certainly not after so long a lapse of time, and the death of one of the contracting parties, and the friend employed by that party to inquire and examine. For aught now to be known, if they were alive, they would discountenance any attempt to vacate the compromise made by them. Under all these circumstances, would it not have been disingenuous on their part, and unjust towards the defendant, to have set up this charge of fraud against him ? He gives a general statement as the basis for a compromise, — is ready to give such particular information as may be required, —offers the books and documents in which the particulars are recorded. The administrators take the subject into consideration, —employ a person, in whom they have confidence, to examine. He engages himself in the work sixteen or seventeen days, reports his satisfaction to the administrators ; they agree to the compromise and accept the money. It is said that their agent was unskilful; they should then have employed another.
If dissatisfaction had been expressed, or a desire for more full examination, Brooks might have furnished it, or at least the compromise might have been refused or suspended. To suffer such a matter to remain sixteen years before any intimation was made of any cause of complaint, and then to ground an imputa *242 tion of fraud, or even negligence, upon a rigorous scrutiny of books and papers which were in the possession, or at the disposal of the party supposed to have been taken advantage of when he made the compromise, would be to carry the searching operation of a bill in equity beyond the bounds of reason and justice. Much weight ought to be given to an answer under oath, in regard to the motives and explanations of doubtful acts, under such circumstances ; and nothing but clear proof should be allowed to countervail it.
The last ground taken for avoiding the contract is the concealment of the state of the French and Spanish claims ; keeping them, as is alleged, entirely out of sight, the defendant having full knowledge that there were such claims, and the administrators being wholly ignorant of the fact and of the nature of such claims. These claims, at the time of the settlement, existed in the character of a right to salvage upon property insured by Hubbart during the existence of the copartnership. In the year 1808 nothing more was known of them, than that the captures or the condemnations were illegal, and that the governments were bound by general principles of justice to make restitution. The situation of the Spanish and French nations and governments at that time, was not such as to afford any reasonable hopes of redress for injuries which could be repaired only by money. Thei;e was perhaps an obligation on the government of the United States to procure redress for its citizens, or themselves to reimburse them. But the expectations were so small that claims thus situated were thought to be of little or no value.
It is alleged in the bill, that these claims were not thought of by the parties, and not taken into the estimate in the compromise, and it is so admitted in the answer. They were involved in the general mass of losses paid for at the office, subject to such salvage as might afterwards happen to them. Nothing was paid for them ; they formed no part of the consideration of the compromise, distinct from other losses which had accrued to the office and bad been paid there.
This subject is presented in two views ; first, as going to avoid the compromise, on the g-ound of fraud in withholding *243 knowledge possessed by the defendant; and secondly, as showing that if the compromise is sustained, these claims, not being the subject of it, did not pass by the transfer, so that the money recently received on their account belongs to the estate of Hubbart.
In regard to the first ground, we think it clear that the facts do not show any such concealment as will effect the purpose proposed. The representation did not purport to give any account of sources from which by possibility advantages might accrue on policies actually settled and paid. It was supposed by both parties that contingencies of this nature existed. There might be salvage upon every loss which had been paid. But the defendant was not possessed of more information as to the possible future value, than every citizen of the United States had, or might have obtained. The facts from which calculations were to be made, were of a public nature, open to every one, consisting of state papers and documents, which had been published by the government. It was a case of equal knowledge, except that the defendant, from the nature of his business, may be supposed to have been capable of forming a better calculation than the party he dealt with. But he swears in his answer, that they were not thought of, and there is no reason to suppose that they were ; indeed the charge in the bill is founded upon their having escaped attention. Except for the purchase made of the Floridas, a political measure, probably of great wisdom, they would not be thought of even now. There seems to be no ground to impute fraud, for not making the existence of these claims, dormant as they then were, an item in the representation. And here again the administrators possessed the means of knowledge, that there were such claims. The books contained an account of every policy, and the occasion of every loss. And it was in their power to have presented this as an obstacle to the compromise, or to have seen that it formed an exception.
The conduct of several other underwriters in regard to these claims shows the estimate in which they were held. Two only, and those the most careful and skilful, provided against this contingency ; the others entered into the compromise without *244 attending to it. There is no fraud, actual or constructive, m this branch of the case.
But it is insisted, that owing to the very circumstances which may excuse the defendant from the imputation of fraud, in regard to these claims, the ignorance of the parties of their jxistence and value, and they not being taken into the estimate on the making of the compromise, they ought to be considered as not having passed by the general words of the transfer. For myself, I should be glad to come to this conclusion, and have labored much to do so ; not because I have thought there was any thing unfair in the transaction, for I verily believe that these claims were deemed of too little value to enter into the computation by either party, but because I entertained the notion, that the very insignificance of the claims, which occasioned the utter negligence of them in the compromise, and their great value at the present time, arising from unforseen circumstances, furnish some reason, in a scrupulous nicety of dealing, to hesitate whether an advantage thus obtained, though fairly, ought to be retained. If they had been estimated at the lowest possible price, so that the minds of the parties had been brought to the consideration of them, the purchase would have been but a common speculation not to be complained of.
We however are bound to consider what is the legal effect of the contract between the parties, and if it cannot be avoided on the ground of fraud, we cannot interfere with it. The claims were contingencies, and as such were capable of transfer, and their subsequent value does not form a ground for relief against it. They were a part of the general mass of contingencies intended to be transferred, for which the assumption of outstanding risks, great or small, was a legal consideration. It seems to be a principle of equity as well as law, that a general conveyance of a whole, carries all the parts, however remote, and although not contemplated at the time of the bargain. The defendant, by the compromise, was substituted to Hubbart in every thing relating to the insurance accounts; these claims were a part of them. If the transfer is not defeated, these cannot be taken out of it. These claims come within the general words, and therefore pass. Com. Dig. (Hamm, ed.) *245 Grant, E 9, in note ; Evans’s Pothier, p. 59, 60 ; Mortimer v. Capper, 1 Bro. C. C. 158.*1
We have taken this view of the case, prolix perhaps, but after all not minute, because the nature of the demand, the circumstances under which it is brought forward, and the powerful manner in which it has been supported in the previous preparavon, as well as in the skilful but honorable manner in which it has been conducted in court, seemed to demand an examination of the general merits of the bill. We might have taken a shorter route to discharge ourselves of the case, for we are all satisfied that the plaintiff’s claim, except that part which will be particularly considered by itself in the close, is barred by the statute of limitations.
The statute is insisted on as a bar, and this being the first opportunity we have had to consider maturely its application to processes in equity, it has become our duty to ascertain how far it is affected by principles usually applied in courts of chancery, † In England we understand the courts of equity do not consider the statute binding upon them ex proprio vigore ; at least that is the opinion of some who administer equity in these courts ; but they adopt and admit it with certain limitations and exception as an equitable rule of decision. They exercise certainly a very broad discretion in this particular. Without the statute, they reject claims sometimes on the ground that they are stale, or that the state of things has been acquiesced in, and that there has been laches, and this within six years. At other times, they uphold claims even beyond twenty years and when the original parties to the transaction have all deceased.
*246 It certainly may be doubted whether this Court has su< h extensive discretion in regard to a statute made for common security and public convenience. The statute of limitations may not, in terms, reach suits in equity in England, because it speaks of actions, which is a term generally signifying suits at commoi law. But it should be considered, that our statute of limitations was enacted long before there was any remedy by suit in equity, and that the legislative provision covered all the remedies for debt on simple or implied contract then known in the Commonwealth, specially including actions of account, which was the only remedy by one partner against the other, without an express promise to account. When new remedies were given or-particular subjects for which remedies also at common law existed, though not so convenient, it cannot be supposed the legislature intended a virtual repeal of the statute of limitations and thus to open the door of litigation on subjects which had slept quietly for years under that statute. Nothing but an express declaration of the legislative will could work so unexpected an effect.
The statute therefore operates with us ex vigore suo, in equity as well as at law, and not by the discretion or courtesy of the courts.[1]
But there are certain subjects which are not within the reach of the statute, even with us, in chancery proceedings. One is that of trusts, which were never directly subject to an action at common law, and therefore not within the view of the legislature when the statute was passed, and because from their very nature they could not be subject to limitation while1 they continued undischarged.* Now we understand that this exception, even in England, is confined to direct trusts created by deed or will; or perhaps by appointment of law, such as executorships or administrations ; of which, however, we do *247 not speak with certainty. But cases of constructive trusts re-suiting from partnerships, agencies, and the like, are held there to be subject to the statute. And this doctrine is fdopted and lucidly explained by Story J. in the case of Robinson v. Hook, 4 Mason, 139.
The trust attributed to the defendant in this case, is clearly ^ of the latter sort, a constructive trust. He is rather quasi trustee, or was at the time of the compromise. On the dissolution of the copartnership with Hubbart, having his funds in his hands and the accounts to be settled, he was debto'r under cir-l i cumstances which imposed on him, to a certain extent, the du-f ties of a trustee. It is a constructive trust, and so subject tcj the statute of limitations. And this is a most reasonable docf trine, for as almost every relation between man and man may,[1] in a court of equity, be converted by construction into a trust,! if such trusts were held to be unaffected by the statute, it woulcl be repealed by judicial discretion. And we should see a man held liable or discharged under the same laws, according to the tribunal into which he might be called. An action at common law, but for the statute, would lie for any branch of the claim set up by the plaintiff in his bill.
The case cited from our own reports, (5 Pick. 321,) was a case of the former description, — of an actual trust, created by will; and in a very brief sentence, perhaps the germ of the law on this subject is expressed. The Court say, “ the general statute of limitations of six years does not affect trusts; so much however of the demand as consists of labor and services may be barred by that statute.” With regard to the latter demand, possibly a court of equity might have held the administrator, by construction of law, a trustee, for the labor sued for was done by a person non compos mentis, and the administrator was the trustee of his real estate, upon which the work was done. At most, however, it was only decided, that an actual trust created by will is not affected by the statute of limitations.[1]
*248 The other ground upon which the statute of limitations is allowed to be avoided is fraud ; * and we do not discern, upon examination of the authorities cited, any material difference in the principle when applied in chancery and when at law. The common law allows fraud, if not discovered until within six years before action brought, to be a good answer to the statute ; as in Homer v. Fish, 1 Pick. 435. Courts of equity do no more, except that they do not in all cases require a recent discovery of the fraud to repel the statute. The general doctrine however is, that the lapse of six years after the discovery is a bar-.[1] At common law an action of tort, or fraud, or deceit itself, will be barred by the statute, and therefore the party, to avoid it, must show a disability to sue, from want of knowledge of the facts constituting the fraud, until within six years.
In this case the fraud alleged, or rather supposed fo arise out of the facts, has relation to a settlement which took place eighteen or nineteen years before the bill was filed, and the party supposed to be injured had the means then, as well as since, to detect and expose it. A new representative of the estate has sprung up, who professes to have discovered fraud from the same materials which were in the hands of his predecessors. One of the same heirs who sanctioned the settlement and who must have suffered from the fraud, if any were committed, has remained to the present time in full possession of understanding and means to recover his rights. Nothing new has transpired, except the receiving of a considerable sum of money from claims transferred, and supposed, at the time, to be with out value.
We think this would be deemed a stale demand in England, and with reason, for it would be in the highest degree mischievous to the interests of men and the peace of their families, if *249 such old transactions, for a long time supposed to be settled, and when those who best knew whether they were injured or not are dead, should be «nravelled upon surmises or slight suggestions, or even upon circumstances which may appear strong, but which the very lapse of time itself may render it impossible to explain ; and this too where the party supposed to be injured was not in necessitous circumstances, so as to be exposed to extortion or undue influence, or without friends to assist him in the protection or recovery of his rights. The whole community might well tremble at this formidable engine, a bill in equity, should length of years, and settlements deliberately made, be no defence to it. But besides this, we are satisfied, after a full examination of all the authorities cited, that the general doctrine of courts of chancery is, that when the statute is insisted on as a bar, it cannot be avoided by mere constructive fraud, which may be, as appears in many cases, and which it is acknowledged was in this, consistent with moral integrity and innocence of intention. To make an imperfect statement which the party believes sufficient to give adequate knowledge, being ready, if asked, to give all further information, is called fraud, constructive fraud, in certain relations, but there is n-' case of this kind which will warrant us in saying that the statute of limitations should not be applied to it.
Having examined with great care all the authorities cited upon this point, I think I may venture to affirm, that there is scarcely one decision of a court of chancery which goes to reject the statute of limitations as a bar, except where actual fraud has been committed. It may appear otherwise in some of the compilations, and in the marginal notes to some of the cases ; but in looking into the cases themselves it will be' found that fraud is the ground of the decision. In this Court we think as much force must be given to the statute, when pleaded to a bill in equity, as to an action at common law, and it can be avoided in the same way only ; that is, by showing that there had been a concealment, and that the discovery of the fraud was only within six years ; and this allegation may be traversed in order to set up the statute. If the aggrieved party knew of the fraud when it was committed, or had full *250 possession of the means of detecting it,[1] which is the same as knowledge, neglect to bring forward his complaint for more than six years will deprive him of his remedy, and ought to, upon the very principles and reasons on which the statute of limitations was enacted. We apprehend, that if we should sustain a bill founded on fraud committed more than six years before the filing of the bill, without any proof of an actual concealment of it and a discovery only within the time of limitation, we should, to a great extent and in a large class of cases, judicially repeal the statute ; which we certainly are not inclined to do, believing it would be a usurpation of power, and believing also that the statute is beneficial in its operation upon the community.
To support our opinion upon this part of the subject, a multitude of authorities might be arrayed, but as they have all been examined and compared by a most able hand in the case of Kane v. Bloodgood, 7 Johns. Ch. R. 90, 114, we may well spare the profession the tedium of repeated citations of the same authorities. By consulting the case last referred to, it will be seen that the present chancery doctrine in England, as well as in New York, is, that except in cases of strict trust, which from their nature are cognizable only in a court of equity, there is very little difference in the application of the statute of limitations in the two jurisdictions of law and equity; and Chancellor Kent is of opinion, that even in these excepted cases, when the trustee shall put himself in hostility with the cestui que trust, and set up an adverse claim or right, the statute will be a shield to him, if he chooses to shelter himself behind it. I cite only two or three modern cases to show that the courts of chancery in Great Britain now, instead of yielding a sort of comity to this most important act of parliament, begin to feel that they, as well as other tribunals, are bound by it and are willing to acknowledge the obligation. As early as the time of Lord Camden it was asserted, that “as often as parliament had limited the time of actions and remedies to a certain period in legal proceedings, the courts of chancery adopted that rule and applied it to similar cases in equity. 3 Bro. C. C. 639. And *251 '.dore his time Lord Macclesfield drew the line distinctly between those trusts which are not affected by the statute, and those which are governed by it, limiting the former to those only which are mere creations of equity and wholly unknown at common law. Lord Hardwicke followed the same track, as in Sturt v. Mellish, 2 Atk. 610.
There have undoubtedly been great departures from this line of demarcation, but the courts are returning to it, as the common law courts in England have been returning to the true spirit of the statute of limitations, from which there had been foi a century or more such enormous deviations.
In the case of Medlicot v. O'Donel, 1 Ball & Beatty, 166, the Lord Chancellor of Ireland (Manners) says, “ I confess I think the statute is founded upon the soundest principles and the wisest policy, and that this court, for the peace of families, and to quiet titles, is bound to adopt it, in cases where the equitable and legal title so far correspond, that the only difference between them is, that the one must be enforced in this court, the other in a court of law.”
And in cases of fraud, where the facts constituting the frauu are known, where there is no subsisting trust, or continuing in fluence, the same principle will apply.
There are numerous cases of the same import; and they apply exactly to the case before us. Whatever was the nature of the trust with which the defendant was originally charged as partner of Hubbart, or as agent of underwriters, it ceased to exist at the time the settlement was entered into. For six teen or eighteen years afterwards, whatever fund he had he claimed to hold as his own. An action at common law lay against him for any moneys fraudulently or perhaps mistakenly retained. Such an action would long ago have been barred by the statute ; and when the legislature created a new tribunal, it was not intended to revive suits over which this mantle of oblivion had been thrown.
It remains only to consider the last point; which is, that although the settlement may not be avoided, yet there being errors in the account exhibited as the basis of the settlement, the plaintiff ought to be let in to surcharge and falsify.* It is *252 admitted in the answer, that erro.s to a certain extent do exist) aDd from the testimony of Stimpson, who went through a laborious examination of the books during several months, it would seem that they amount to no inconsiderable sum. We have already expressed our opinion, founded on the answer of the defendant, which is uncontradicted by proof, as well as upon the vastness and complexity of the accounts, that these errors furnish no ground of suspicion of unfairness or fraud. Stimpson states that the books were as plain and as fairly kept as any he ever knew. But fraud is not necessary to entitle the party to surcharge and falsify, if the defendant cannot avail himself of the statute bar.
It is however urged by the defendant’s counsel, that as an exact settlement of accounts was not intended, but only a compromise, mistakes or errors ought not at this period to be corrected, because they may have had no effect upon that compromise, it being quite probable, as he states, that the same adjustment would have been made, if the aggregate of balances had stood as Stimpson makes them appear on his statement of the account. But we cannot be of this opinion. The sum exhibited to the administrators as the basis of adjustment, was $64,688-72. If the true balance was $68,276, the presumption is violent, that the sum offered would have been thought too large a deduction for the contingencies supposed to exist. Both parties acted upon a fallacious basis, and though this is not ground for setting aside the settlement, it is ground for rectifying the account.
We must then look to the evidence relied upon to deprive the defendant of the benefit of the statute, in regard to these errors. And this is to be found in the deposition of Stimpson.
In his answer to the 20th interrogatory he says, that in a conversation with the defendant which was within two years before the bill was filed, respecting errors in the account which he, Stimpson, had discovered, the defendant said, after admit *253 iing there were errors, “ I am willing to pay all errors and interest on them, and you are authorized to say as much. I do not wish you to say it as from me, but you may say this,” and then pointing to the account of interest money received, he said, “ I shall give you little trouble on that account, but I do not make the amount as much as you do.” The witness adheres to this testimony after cross-examination.
This would be quite sufficient, in an action at common law, 0 avoid the effect of the statute, for it proves an acknowledgment of errors, and a promise to pay their amount with interest.*1 But it is a rule in equity, that a party is not to be charged upon any fact stated in the bill, against his own denial, in his answer under oath, of the existence of such fact, if the proof of the fact is only by one witness; upon the equitable principle, that if he is put upon his oath by his adversary, credit shall be given to his own declaration, unless it is contradicted by at least two witnesses, or by written documents. But then the answer, to have this power, must be direct, positive, and unequivocal. Wetmore v. White, 2 Caines’s Cas. in Err. 106 ; Le Neve v. Le Neve, 1 Ves. sen. 66, and Walton v. Hobbs, 2 Atk. 19 ; Only v. Walker, 2 Atk. 407 ; Arnot v. Biscoe, 1 Ves. sen. 97. The answer of Brooks to this charge, we do not think of that character. It may have been his understand ing of his declaration to Stimpson, but not having the power tu know his thoughts, we must govern ourselves by his words and give to them their natural meaning.
He denies “ that he ever made such a promise as he is falsely stated in the bill to have made within two years last past.” — “ He might have stated, that if any important, palpable errors, of a nature to affect the character of said settlement, should be found, they ought and should be corrected ; but that unimportant differences between an exact account and the abstract used, should not and would not be permitted by the defendant, at this period, to operate on or affect said settlement. He denies that *254 any admission, of other or different meaning from this, was evei made by him.
Now we do not think this amounts to a direct denial of the charge in the bill, but it is an admission of a conversation with Stimpson on the subject, in which there was an acknowledgment of errors in the account, and of a willingness to correct them if they should be of importance enough to affect the settlement. Now although defendants, in answer to a charge in a bill, may protect themselves against the testimony of a single witness by a direct denial of the charge, we do not think they are at liberty to give such construction to their own words as will avoid the natural sense and meaning of them. But admitting there is such a right, we are inclined to think that the answer should be taken to admit at least a conditional promise to correct errors, that is, if they should be so important as to have produced an effect upon the treaty of compromise. In this light it would be like a conditional promise in an action at law, which is allowed to obviate the statute, if the plaintiff in the action proves that the condition has been performed or the contingency has happened. We cannot but think that the sum of $ 4000 would be deemed, even in so great a concern as this, sufficiently large to have been taken into the estimate on the question of a compromise; and therefore, upon the answer and the testimony of Stimpson, we think it very clear, tha* in regard to the errors in the account, the plea of the statute of limitations ought not to avail. .
The result of the whole is, that the settlement, made on the 4th of April, 1808, is not set aside, but confirmed ; but the plaintiff is allowed to surcharge and falsify the account exhibited on which the settlement was made, so far as respects erroneous debits or credits in that account ; and for this purpose the case is referred to a master to state the account anew and to allow interest upon the difference between the foot of the account exhibited, and the true balance which shall be found upon correction of errors, from the 4th of April, 1808, to the time of making his report.[1]

 To show that the agreement would not be set aside except for fraud, the defendant’s counsel cited Chappedelaine v. Dechenaux, 4 Cranch, 309; Stoughton v. Lynch, 2 Johns. Ch. R. 218, 219; 1 Mad. Ch. Pr. (2d ed.) 103,262, 280; Cann v. Cann, 1 P. Wms. 727; Stapilton v. Stapilton, 1 Atk. 10 ; Pullen v. Ready, 2 Atk. 592; Lewis v, Pead, 1 Ves. jun. 19; Vernon v. Vawdry, 2 Atk. 119; 2 Eq. Cas. Abr. 8; Gordon v. Gordon, 3 Swanst. 476; Halhed v. Marke, ibid. 444, note; 1 Hovend. on Fraud, 160; Osmond v. Fitzroy, 3 P. Wms. 139; Willis v. Jernegan, 2 Atk. 591; Milner v. Cowley, 8 Price, 620; Lloyd v. Passingham. Cooper, 156; Beaumont v. Bramley, 1 Turner, 51; Evans v. Bicknell 6 Ves. 183, 189. Reporter.

 For the plaintiff were cited Wormley v. Wormley, 8 Wheat. 421; Fullagar *222 v. Clark, 18 Ves. 481; — for the defendant, Gordon v. Gordon, 3 Swanst. 472 2 Mad. Ch. Pr. (2d ed.) 168, cites Flint v. Field, 2 Anstr. 543. Reporter.

 In regard to a settlement made by a party under ignorance of his rights, the plaintiff’s counsel cited 1 Mad. Ch. Pr. (2d ed.) 76, 269, 967; Pullen v. Ready, 2 Atk. 592; 1 Fonbl. 115 et seq.; Pusey v. Desbouvrie, 3 P. W«ns. 315, Salkeldv. Vernon, 1 Eden, 64; Jarvis v. Duke, 1 Vern. 19; P‘~l~l/’S V. Stewart, 1 Sch. & Lefr. 209; Murray v. Palmer, 2 Sch. & Lefr. 474 : Madeford v Anstwick, 1 Simon, 89; Shepherd v. Chemter, 1 Camnb. 274; Can.'' v. Allen. 2 Dow, 294, 299; Selsey v. Rhoades, 2 Sim &. Stu. 49: Beaun mt v PovPbee, 5 Ves. 491, 493; Dunbar v. Tredennick, 2 Ball A. Beattv 317; — for the 4e fendarit were cited, Clialmer v. Bradley, 1 Jac. & Walk. 68 Pettyn v. Reverts, Ambl. 317: Walker v. Symonds, 3 Swanst 73 hunwtet

 For the plaintiff was cited 1 Mad. Ch. Pr. (2d ed.) 280; — for the defendant. Lewis v. Pead 1 Ves. jun. 19; Willis v. Jernegan, 2 Atk. 251; Osmond v. Fitzroy, 3 P. Wms. 131. Reporter.

1 See Chitty on Contr. (4th Am. ed.) 107, 108- Dodds v. Wilson. 1 Const R. (S. Car ) 448; Some v. Skinner, 16 Mass. R. 358. .

 As to the authority of the administrators to make the settlement, the defendant’s counsel cited Toller (4th ed.), 162, 359, 407; Coffin v. Cottle, 4 Pick 454; 2 Eq. Cas. Abr. 10; Nugent v. Gifford, 1 Atk. 463. Reporter.

 On this subject were cited for the plaintiff, 1 Mad. Ch. Pr. (2d ed ) 110, 113; 1 Fonbl. 66, 126, 127, 133 ; 2 Fonbl. 187; Sugd. Vend. (5th ed.) 504, 505,508,515; 1 Hovend. on Fraud, 145,146, 152, 153; Fox v M'Reth, 2 Bro, C. C. 400; Whichcote v. Lawrence, 3 Ves. 740; Prevost v Gratz, 1 Peters’s Circ. C. R. 367,368; Huguenin v. Baseley, 14 Ves. 273, 300; Harris v. Tremenheere, 15 Ves. 34, 39; Dunbar v Tredennick, 2 Ball & Beat. 304, 317; Barrow v. Rhinelander, 1 Johns. Ch. R. 550; Davoue v. Fanning, 2 Johns. Ch. R. 257; Rogers v. Rogers, 1 Hopk. 524, 525; Butler v. Haskell, 4 Desauss. 715 ; Jeremy on Eq. Jurisd. 385, 395; Griffiths v. Robins, 3 Mad. Ch. Rep. 191; Ormond, v. Hutchinson, 13 Ves 51. For the defendant were cited, Crowe v. Bullard, 3 Bro. C. C. 117; Cane v. Allen. 2 Dow, 289; Ex parte Bennett, 10 Ves. 381; Downes v. Grazebrook, 3 Meriv. 208, and note b. Reporter.

 A compromise, obtained from a party ignorant of his rights, may be set aside by a court of chancery. Anderson v. Bacon, 1 Marsh. (Ken.) 51. So of a compromise founded on misinformation and delusion. Mosby v. Leeds, 3 Call, 439. See Hoge v. Hoge, 1 Watts, 163; 1 Story’s Comm. Eq. 145 to 147.

 In regard to the employment of Bean as an agent, the defendant’s conn Bel cited Stephens v. Bateman, 1 Bro. C. C. 22.

 In regard to interest, the plaintiff’s counsel cited 2 Fonbl. J84,note ; New ton v. Bennet, 1 Bro. C. C. 359; Pocock v. Rcddington, 5 Ves. 794; 1 Hovend on Fr. 156; Paley on Princip. & Ag. 41, 42; -V. Jolland, 8 Ves. 72; Rogers v. Boehm, 2 Esp. R. 7C4; Treces v Townshend, 1 Bro. C. C. 384; Franklin v. Frith, 3 Bro. C. C. 433; Willis v. Commissioners &c. 5 East, 22; Pearse v Green, 1 Jac. & Walk. 135, 140; Massey v. Banner, ibid. 241, 250 ; Rockev. Hurt, 11 Ves. 61 ; Hardwickev. Vernon, 14 Ves. 504, 508; Walker v. Woodward, 1 Russell’s R. 107; Sutton v. Sharp, ibid. 151; Moons v. De Bernales, ibid 305; Dunscomb v Dunscomb, 1 Johns. Ch. R. 508; Manning v. Manning, ibid. 527; Stoughton v. Lynch, 2 Johns. Ch R. 213; Brown v. Rickets, 4 Johns. Ch. R. 303 ; Wyman v. Hubbard, 13 Mass. R. 233; Robbins v. Hayward, 1 Pick. 528; Stearns v. Broma, ibid. 534.
The defendant’s counsel cited Chedworthv Edwards, 8 Ves. 48; Beaumont v. Boultbee, 11 Ves. 360; Hardwicke v. Vernon, 14 Ves. 509; Raymond v Bearnard, 12 Johns. R. 274 ; Rickards v. Salter, 6 Johns. Ch. R, 445; Shipley v. Hammond, 5 Esp. R. 114 ; Boddam v. Ryley, 1 Bro. C. C. 239 ; S.C. 2 Bro. C. C. 2; Consequa v. Fanning, 3 Johns. Ch. R. 5S7, 601 ; Williams v. Storrs, 6 Johns. Ch. R. 353; Jacobs v. Mams, 1 Dallas, 52; 1 Hovend. on Fraud, 161. Reporter.

 A person entitled to money and resisting the reception thereof, has no right to interest thereon. Craig v. Penick, 3 J. J. Marsh. (Ken.) 19.

 See Chitty on Contr. (4th Am. ed.) 502 to 507, and cases cited in the notes; Waggoner v. Gray, 2 Hen. & Munf. 603; Connico v. Curzen, 2 Call, 358; Consequa v Fanning, 3 Johns. Ch. R. 601.

 The plaintiff’s counsel cited 1 Mad. Ch. Pr. (2d ed.) 267, 270;— the defendant’s counsel, 1 Fonbl. 106; Mortimer v. Capper, 1 Bro. C. C. 158 ; Stephens v. Bateman, ibid. 22; Evans v. Brown, Wightw. 102. Reporter.

 See 1 Story’s Comm. Eq. 310 to 312.

 The defendant’s counsel cited likewise Freeman v. Chandos, Cowp. 360, Beaumont v. Bramley, 1 Turner, 51 ; Batty v. Lloyd, 1 Vern. 141 ; Stephens v. Bateman, 1 Bro. C. C. 22. Reporter,

1 See Welch v. Bradbury, 16 Pick. 375; 1 Story’s Comm. Eq. 159 to 164.

 To show that the statute of limitations was a bar to the plaintiif’s claim, the defendant’s counsel cited Bridges v. Mitchell, Gilb. Eq. Rep. 224 ; 3 Eq. Cas. Abr. 579; 1 Mad. Ch. Pr. (2d ed.) 98, 99, 100; Stackhouse v. Bamston, 10 Ves. 469; Sherman v. Sherman, 2 Vern. 276; Hercy v. Dinwoody, 4 Bro. C. C. 268; Lacan v. Briggs, 3 Atk. 105; Pickering v. Stamford, 2 Ves. jun. 583; Brownell v. Brownell, 2 Bro, C. C. 63; Gregory v. Gregory, Cooper, 201 ; Lackey v. Lackey, Finch’s Prec. Ch. 518; Deloraine v. Browne, 3 Bro. C. C. 639 ; Kane v. Bloodgood, 7 Johns Ch. R. 90; Hovenden v. Bnnesley, 9 Sch. & Lefr. 607. Reporter

 See Johnson v. Ames, 11 Pick. 182.

 On this subject the plaintiff’s counsel cited Hemmenway v. Gates, 5 Pic a. 321; 1 Mad. Ch. Pr. (2d ed.) 100; Pickering v. Stamford, 2 Ves. jun. 581 , Salkeld v. Vernon, 1 Eden, 04 ; Vernon v Vawdry, 2 Atk. 119; Murray v. Palmer, 2 Sell. & Lefr. 474; Hardwicke v. Vernon, 14 Ves. 504; Roche v. O'Brien, 1 Ball & Beatty, 330 : Oliver v. Court, 8 Price, 170; Barrow v Rhinelander, 1 Johns. Ch R. 550; Butter v. Haskell, 4 Desouss. 706. R& porter.

 See Hemmenway v. Gates, 5 Pick. (2d ed.) 522, note 2; Bangs v. Hall, 2 Pick. (2d ed ) 372, note 1, and cases cited; Andrews v. Sparhawk, 13 Pick. 393; 9 Peters, 416, 417; Sherwood v. Sutton, 5 Mason, 143; Terrill v. Murry, 4 Yerger, 101

 The plaintiff’s counsel cited Homer v. Fish, 1 Pick. 435: — the defendant’s counsel cited Gregory v. Gregory, Cooper, 201 ; 3 Eq. Cas. Abr. 580; First Mass. Turnp. v. Field, 3 Mass. R. 206. Reporter.

 See Homer v. Fish, 1 Pick. (2d ed ) 438, note 1; Welles v. Fish, 3 Pick. (2d ed.) 75, note 1, and cases cited; Morton v. Chandler, 8 Greenleaf, 9; Colt v. M'Glathry, 9 Greenleaf, 131; Sherwood v. Sutton, 5 Mason, 143; Revised Stat. c. 120, § 12; Troup v. Smith, 20 Johns. R. 33.

 See Cole v. MlGlatkry, 9 Greenleaf, 131

 For the plaintiff were cited 1 Fonbl. 15 ; Roberts v. Kuffin, 2 Atk. 112;— *252 for the defendant, Vernon v Vawdry, 2 Atk. 119; Sewell v. Bridge, 1 Ves sen. 297; Pomfret v. Windsor, 2 Ves. sen. 482; Pit v. Cholmondely, ibid. 565; Lloyd v. Passingham, Cooper, 156; 1 Hovend. on Fraud, 160; Gordon v. Gordon, 3 Swanst. 463, 476; Bloodgood v. Zeily, 2 Caines’s Cas. in Err. 124 Reporter.

 As to the acknowledgment, the plaintiff’s counsel cited Colledge v. Horn, 3 Bingh. 119; Clark v. Hougham, 2 Barn. & Cressw. 149; Beaumont v Boultbee, 5 Ves. 485; — for the defendant were cited, Evans r. Bicknell, 6 Ves. 183; A’Court v. Cross, 3 Bingh. 329; Tanner v. Smart, 6 Barn. & Cressw. 603; Bell v. Morrison, 1 Peters, 361. Reporter.

1 See Chitty on Contr. (4th Am. ed.) 639 et seq,, and notes.

 See 1 Story's Comm. Eq. 497 et seq.